[Cite as *Cleveland v. Washington*, 2013-Ohio-367.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### Nos. 97945 and 97946

---

## CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

## DAISEY L. WASHINGTON

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cleveland Municipal Court
Case Nos. 2011 CRB 017672
and 2011 CRB 017651

**BEFORE:** S. Gallagher, P.J., Rocco, J., and Keough, J.

**RELEASED AND JOURNALIZED:** February 7, 2013

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender
By: Erika B. Cunliffe
        Paul Kuzmins
Assistant Public Defenders
Courthouse Square Suite 200
310 Lakeside Avenue
Cleveland, Ohio    44113


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
Interim Director of Law
City of Cleveland
By: Bridget E. Hopp
Assistant City Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio    44113

SEAN C. GALLAGHER, P.J.:

**{¶1}** Defendant-appellant, Daisey Washington ("Washington"), appeals from her convictions for aggravated menacing, a petty offense. For the reasons set forth below, we affirm.

**{¶2}** Washington was charged with aggravated menacing and two counts of assault in Cleveland M.C. Nos. 2011 CRB 17672 and 2011 CRB 17651. The victims were identified as Juahmea Harris ("Harris") and Jeffrey Rivers ("Rivers"). The matters were consolidated for trial in municipal court.

**{¶3}** A week after oral argument, Washington filed a motion to supplement the record with additional pretrial transcripts, dated June 14, 2011, June 28, 2011, July 19, 2011, August 2, 2011, August 17, 2011, September 12, 2011, and September 26, 2011. There is still no transcript of the arraignment proceedings held on June 8, 2011.

**{¶4}** Initially, Washington was represented by retained counsel, who attended pretrials on June 14, 2011, June 28, 2011, July 19, 2011, August 2, 2011,[1] and August 17, 2011. Trial was set for September 12, 2011.

**{¶5}** On August 29, 2011, Washington's counsel moved for leave to withdraw because she had discharged him. The court issued a journal entry on September 12, 2011, which was the original trial date, and granted the motion to withdraw. Washington

---

[1] There is a note on this journal entry indicating that "per atty, he is looking for additional 9-1-1 tapes Trial date to be set at next PT."

was granted a continuance to obtain new counsel, and trial was re-set for September 26, 2011.

**{¶6}** On September 26, 2011, Washington appeared with a public defender and trial was continued to October 17, 2011. On that day, Washington appeared with a different public defender for trial. Counsel's oral motion for jury trial was denied as untimely, and his motion for continuance was also denied. At the conclusion of the trial, the matter was continued to October 24, 2011, for a verdict. The court found Washington not guilty of assault but guilty of both menacing counts. The court imposed sentence but stayed it pending this appeal. The substantive facts will be set forth where relevant to resolving Washington's assignments of error.

Assignment of Error I:

The trial court abused its discretion by denying Daisey Washington a continuance so that she could invoke her right to a jury trial in accordance with applicable rules and so that her attorney could prepare for trial.

**{¶7}** On October 24, 2011, Washington's attorney made an oral request to continue to enable Washington the ability to timely request a jury trial. *See* Crim.R. 23(A). Counsel also indicated he was not prepared for trial because he had just recently returned to work from a six-month leave. The attorney had been assigned the docket that day but had spoken with Washington over the weekend. According to him, Washington had not been advised about her jury trial option by either of her previous attorneys.

{¶8} The court was sympathetic to the "predicament" of the public defender's office but expressed concern over the age of the case and indicated it was ready for trial. The city was prepared to go forward with its witnesses for trial, and there had been several continuances already. The matter proceeded to trial over defense counsel's objection.

{¶9} After closing arguments, Washington's attorney proffered additional comments concerning the motion to continue. He indicated that had a continuance been granted, counsel would have obtained the 911 calls relevant to these cases.

{¶10} The court extensively clarified its grounds for denying the motion to continue by stating:

> This case originally came in front of the Court on June 14. A continuance was granted to June 28. A continuance was granted until July 19. Case came again, on July 19, continued to August the 2, with no final — that being a final continuance.
>
> August 2, another call was made * * * or another continuance was made to August 7, actually August 17, at 1:30.
>
> On August 17 at 1:30, a trial date was set, so actually this is the second trial date this case has had, so we already had * * * a trial date set.
>
> September the 12, case was set for trial at 1:30. At that time, Miss Washington and her attorney had * * * some disagreement of some sort. Counsel filed a Motion to Withdraw, which the Court allowed on trial date.

The Court noted for the record and the journal entry, that on the trial date, the City was ready to proceed at that time for a trial in front of the Court, which would have been September 12, at 1:30.

Miss Washington was given a continuance on that date to seek to get a new attorney, with the understanding the trial date had already been set for trial.  It was set immediately thereafter.

Case was set for an additional continuance two weeks later. September the 26, at 1:30, also with the understanding that * * * she was going to go to the public defender's on September the 26 at 1:30.  The case was set for a trial til today's date, October 17, at 11:30.

The Court will note that on September the 26, that the attorney in this case from the Public Defender's Office, announced to the court that a trial date should be set immediately.  That this case needed to come to a head.  The Court did that.

So that is why the Court is not allowing an additional continuance when counsel for defendant asked for that date and that time, and that it be set quickly, and that isn't that quickly.  That's like two and a half, like two weeks, actually three weeks, * * * so that's why the Court is not entertaining a continuance.

The second time the City is ready to proceed and the Court believes that according to the rules, and the rules states, and there's — there's no Jury Demand in this file, in this entire file.  Out of all the motions that have been filed, there's a Motion for Discovery and a Motion for Bill of Particulars.

And in addition to that, the Criminal Rule states that a jury demand is not demanded within the time set forth in the rules, it is waived.

And it was not filed prior to the first trial date. It was not filed prior to today. It's not proper for the Court to entertain that, and because the City was ready to proceed for trial, the Court * * * went forward and had a trial on this case. So for the record, so that we're all clear, and so that if we have to go to the Court of Appeals, there they are.

**{¶11}** A determination of whether to grant or to deny a continuance is a matter left to the broad, sound discretion of the trial judge. *State v. Unger,* 67 Ohio St.2d 654, 23 N.E.2d 1078 (1981); *State v. Wenzlick*, 164 Ohio App.3d 155, 2005-Ohio-5741, 841 N.E.2d 408, ¶23 (6th Dist.), citing *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."); *State v. Bayless*, 48 Ohio St.2d 73, 101, 357 N.E.2d 1035 (1976). The appellate court reviews the ruling by applying the abuse of discretion standard. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983)("'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable").

**{¶12}** Generally, where a party fails to timely retain substitute counsel just prior to the date of trial, substitute counsel's request for a continuance is not an adequate ground for a continuance. *See Woods v. Woods*, 2d Dist. No. C.A. 13487, 1994 Ohio App.

LEXIS 1272, at *2 (Mar. 9, 1994). "[A] judge's denial of a continuance because of counsel's unpreparedness is not an abuse of discretion if the unpreparedness was avoidable." *Hartt v. Munobe*, 67 Ohio St.3d 3, 9, 615 N.E.2d 617 (1993).

{¶13} *Wenzlick* identifies various factors to consider in making the assessment as to whether a trial court abused its discretion by denying a continuance, including

> the length of the delay requested; whether other continuances have been requested and granted; any inconvenience to the litigants, witnesses, opposing counsel, and the court; whether the requested delay is for legitimate reasons or is merely dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and any other relevant factors, depending on the unique facts of each case.

*Wenzlick* at ¶ 25 (other citations omitted).

{¶14} This case presents a very close call. Certainly it would have been reasonable, and arguably more prudent, for the court to have allowed another continuance in this case. The length of delay would not have been unreasonable, nor do we find the reason for continuance was merely dilatory or contrived. However, we cannot conclude that the trial court's denial of another continuance in this case was unreasonable either.

{¶15} The public defender who was ultimately assigned to represent Washington made efforts to prepare for trial, having received the assignment following an extended leave from the office. Counsel made a proffer on the record after trial that he would have obtained the 911 tapes, if a continuance was granted. For that reason, counsel felt he was unprepared to go forward with the trial. However, counsel indicated he had

spoken with Washington before the date of trial. A review of the transcript shows counsel was versed on the facts of the case and had defense witnesses present at the trial.

{¶16} Washington had sought and received continuances in this matter previously. For example, a continuance was granted and the final pretrial date was re-set, with the court's journal entry indicating that defense counsel was attempting to secure "additional" 911 tapes. The supplemental record establishes that all of the 911 tapes were obtained and given to Washington's first counsel. The September 12, 2011 transcript indicates that this attorney gave Washington's file to her. The city had been prepared for trial on at least two different occasions. Initially, the trial was set for September 12, 2011, and the court granted a continuance at that time to allow Washington some time to secure new counsel because she had discharged her attorney. Washington appeared on September 26, 2011, represented by the public defender's office and another trial date was selected for October 17, 2011. The September 26, 2011 transcript reflects that Washington's counsel, from the public defender's office, appeared ready for trial that day; however, the trial was set for October 17, 2011. There was no mention or request for a jury at that time. The city's witnesses were present for the October 17, 2011 trial and would have been inconvenienced by further delay. The court expressed concern that the case had been pending for quite some time and the court does have an obligation to manage its docket efficiently. *Unger*, 67 Ohio St.2d, 23 N.E.2d 1078, at 67.

{¶17} Washington maintains that this case requires a determination as to whether judicial efficiency should trump a fundamental constitutional right, namely the right to a

jury trial. It does not. Crim.R. 5(A)(5) requires the judge or magistrate to inform the accused of her "right, where appropriate, to jury trial and the necessity to make demand therefore in petty offense cases" at the initial appearance. The record establishes that Washington was represented by two previous attorneys and had been represented by the public defender's office since September 26, 2011.[2] The September 26, 2011 transcript establishes that the public defender's office assumed Washington's representation sometime after September 12 but before September 26. During that hearing, counsel indicated, "[Washington] is [represented by the public defender's office] and has been * * *. She has been to our office." Neither of Washington's previous attorneys demanded a jury trial, and the judge indicated the subject trial date was set at the suggestion of Washington's counsel. Indeed, Washington's counsel appeared ready for trial on September 26 and did not mention or demand a jury. We cannot infer from this record that Washington was unaware of the need to timely demand a jury trial.[3] Washington has

---

[2] We are mindful that office policies and practices are likely in place that sometimes result in a series of different public defenders being assigned/re-assigned to each case. How that may affect a client's rights must be balanced with the court's legitimate interest in maintaining its docket and the prompt, efficient administration of justice. *Unger*, 67 Ohio St.2d, 23 N.E.2d 1078, at 67 ("Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.").

[3] The pretrial transcripts reflect that Washington was advised of her right to a jury on June 14, 2011 as follows:

> You have the right * * * to a trial by jury in all but Minor Misdemeanor cases which must be tried [to the court].

not provided us with a transcript of her arraignment proceedings, and thus we must presume regularity and conclude that the municipal court complied with Crim.R. 5(A)(5) by giving the advisements required at the initial appearance. *State v. Miyamoto*, 3d Dist. No. 14-05-43, 2006-Ohio-1776, ¶11 ("failure to provide an adequate record prevents a defendant from arguing that the trial court failed to inform him of the need to demand a jury trial,* * *.").

{¶18} When all of the foregoing circumstances are considered in the context of the applicable law, the trial court did not abuse its discretion by denying the continuance that was requested on the day of trial.

{¶19} This assignment of error is overruled.

Assignment of Error II:

Ms. Washington was deprived of her liberty without due process of law, where her convictions for aggravated menacing are against the weight of the evidence presented.

{¶20} In reviewing a claim challenging the manifest weight of the evidence, the question to be answered is whether

there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the

---

You have the right to waive or give up your jury trial and still have this matter tried to [the court] on the facts and the law.

That advisement does not comply with Crim.R. 5(A) because it does not inform the accused of the need to file a written demand for a jury trial. However, Washington was arraigned on June 8, 2011; therefore, this was not the initial appearance.

witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

(Internal citations and quotations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶81.

{¶21} The record evidence is summarized below.

{¶22} Jeffrey Rivers testified that he lived on E. 65th Street in Cleveland, Ohio, across the street from Washington. Rivers owned a rental property next door to Washington's home. The two had an ongoing dispute over maintenance and ownership of a vacant lot between the two properties.[4]

{¶23} On May 19, 2011, Rivers was cutting the grass at his rental property with some other workers. One worker was cutting the grass on the vacant lot when Washington came out and started yelling at him.[5] Rivers took over the grass cutting, and Washington then yelled at him to stop. Washington maintained the lot belonged to her. Rivers said Washington was hitting him as he continued to cut the grass. Eventually, Juahmea Harris, Rivers's fiancée, got involved.

{¶24} Harris grabbed the lawn mower and told Rivers to walk away. Washington then began to hit Harris. Rivers said his father, George Rivers ("George"), also witnessed the incident.

---

[4] According to Rivers, the city of Cleveland owns the vacant lot.

[5] Rivers said he would cut the grass on half of the vacant lot.

{¶25} Rivers said he kept cutting the grass as George came over in an effort to separate Harris and Washington. At some point, Harris grabbed Washington's hair and wrestled her to the ground. Washington went back inside her house.

{¶26} Rivers heard yelling and screaming and turned around to see Washington with a .45 automatic, black iron gun pointed to the back of his head. Rivers said he is familiar with guns because he goes to the shooting range.

{¶27} Washington allegedly said, "You're about to stop this sh** right now. I see you are." Rivers said, "You're right," and backed across the street toward his father's house. He was very much afraid.

{¶28} According to Rivers, Washington began chasing his workers and Harris with the gun. Eventually, Washington went back inside her house.

{¶29} George and Rivers both called the police. Rivers called a police commander that he knows. Approximately five police cars arrived, and Rivers told the officers what had happened. The workers who were allegedly involved were no longer there and did not speak to the police.

{¶30} Police went inside Washington's home but did not find a gun.

{¶31} Juahmea Harris testified that she was helping Rivers with landscaping on May 19, 2011. She witnessed Washington confronting the worker who was cutting the grass on the vacant lot. Washington was yelling at the worker to get off of her property. Harris was talking to George when Rivers went across the street to address the situation with Washington. Washington poked Rivers and told him to get off her property.

Harris saw Washington's foot near the running lawn mower. Harris went over to get the lawn mower out of the way. Rivers and Washington were arguing. Then, Washington ran toward Harris, and the two women began pushing each other. Washington punched Harris. Harris pulled Washington's hair weave and restrained her. Rivers and George told Harris to let Washington go. Washington went in her house.

{¶32} Harris called 911 to report that Washington had assaulted her. While Harris was on the phone, Washington came out of her house and pointed a gun at the back of Rivers's head. Harris simultaneously reported this to 911. After Rivers backed away, Washington began waving the gun, saying "I'm going to stop this sh** right now." Harris and the other workers ran away. Harris said she was scared.

{¶33} Police arrived and handcuffed Harris for a period of time. She gave a statement to police.

{¶34} George also testified. On May 19, 2011, he observed Washington yelling at, and pushing, Rivers. George and Harris went across the street to break up the situation. But, Washington aggressively "went after" Harris. Harris restrained Washington by the hair. George and Rivers told her to let Washington go. Washington went inside her house and then came back outside with a gun. She ran up to Rivers and put the gun to his head. Rivers backed away, and Washington started going toward Harris. George called 911, as well as the commander's office. When the police arrived, he gave a statement. He saw police officers go inside Washington's house.

**{¶35}** The police witnesses testified that they responded to E. 65th Street for reports of a female with a gun. The officers secured the area and made an assessment from interviewing persons at the scene. Washington was arrested although she denied the charges. Washington consented to a search of her home. Numerous officers and a K-9 searched her home at least three times but did not find a gun. Washington was advised of her rights and voluntarily gave a statement. Washington denied punching Harris.

**{¶36}** The defense presented the testimony of Tyrone Bell, Washington's son. He was residing with Washington on May 19, 2011. Bell testified that he did not see what transpired between Washington and Harris that day. Bell was not outside. He was, however, present when over ten officers and a dog searched his home. They did not find a gun. Bell has never seen Washington with a gun, and she does not own one to his knowledge. Bell has not ever seen ammunition in his home.

**{¶37}** Tiffany Browning, Bell's girlfriend, was also present when the officers searched Washington's home. She said that Washington came inside yelling that someone had "jumped on" her and her hair was all messed up. Browning did not see Washington with any gun. Browning did not see anything that occurred outside of the house.

**{¶38}** Washington testified in her defense. She confirmed that she argued with Rivers. But according to her, Rivers confronted her and "started the lawn mower" at her. Washington kicked the lawn mower. Harris got involved and was telling Washington to

get off her property. Harris grabbed Washington's hair. Washington ran inside to get Bell and Browning to help her. She denied hitting or threatening Harris or Rivers and denied brandishing a gun. She does not own or have a gun. Washington said she also called 911.

{¶39} Washington challenges her convictions for aggravated menacing pursuant to Cleveland Codified Ordinances 621.06, which provides: "No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of such other person or member of his or her immediate family."

The facts support Washington's convictions for aggravated menacing. There was testimony that Washington threatened both Harris and Rivers. Three witnesses testified that Washington pointed a gun to Rivers's head and also chased Harris with it. This type of evidence has been deemed sufficient to support convictions on weapons offenses even when no gun is ever recovered. *E.g.*, *State v. Warren*, 8th Dist. No. 95671, 2011-Ohio-4633. Therefore, similar testimony in this case supports a finding that Washington threatened both Harris and Rivers at gunpoint even though no weapon was recovered. To the extent Washington maintains the testimony of those witnesses was not credible, the trial court, acting as trier of fact, was in the better position to make that assessment.

{¶40} This assignment of error is overruled.

{¶41} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, PRESIDING JUDGE

KENNETH A. ROCCO, J., and
KATHLEEN ANN KEOUGH, J., CONCUR