[Cite as *In re T.W.*, 2026-Ohio-124.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE  T.W.                                             :

                                                                            No.  115158
A Minor Child                                      :

[Appeal by Mother]                            :

_____

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  January 15, 2026

_____

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-24900213

_____

***Appearances:***

Wargo Law, LLC, and Leslie E. Wargo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

EMANUELLA D. GROVES, J.:

{¶ 1}   Appellant-mother ("Mother") appeals the juvenile court's decision committing T.W., her severely autistic and nonverbal child who was 15 years old at the time of the final hearing, to the permanent custody of the Cuyahoga County Division of Children and Family Services ("CCDCFS") and terminating Mother's parental rights.   Upon review, we affirm the decision.

## I.      Facts and Procedural History

{¶ 2}   In January 2024, CCDCFS filed a complaint for neglect and permanent custody of T.W., along with a motion for predispositional temporary custody.  The complaint alleged that T.W. was adjudicated dependent and committed to the legal custody of his maternal grandmother ("Grandmother") in December 2020.[1]  However, T.W. had complex mental-health, developmental, emotional, and behavioral needs that compromised his safety, generally, and his safety in Grandmother's home.  Grandmother placed T.W. in a group home through the Cuyahoga County Board of Developmental Disabilities (the "Board"); however, he was no longer eligible to remain there because of his behavior.  Grandmother was no longer willing to provide for T.W.'s basic needs, refused to take him home, and failed to make an alternative plan for his care.   T.W. was removed from Grandmother's home in August 2023 and remained in the continuous and uninterrupted custody of CCDCFS from that date forward.[2]

{¶ 3}   The complaint further alleged that Mother had two other children who were adjudicated dependent and committed to the legal custody of a relative because of, in part, her mental health and substance use and a third child who was

---

[1] This appeal addresses the parental rights and responsibilities of Mother only. Based on the record before us, paternity was never established, an alleged father was not identified to Cuyahoga County Division of Children and Family Services ("CCDCFS"), and no one claiming to be T.W.'s father came forward.  As of this date, Grandmother has not filed an appeal.

[2] In August 2023, CCDCFS filed a complaint seeking permanent custody of T.W. However, the complaint could not be resolved within statutory deadlines.

committed to the legal custody of a relative in a private-custody case. According to the complaint, Mother failed to address concerns regarding her mental-health and substance use.

**{¶ 4}** Mother and Grandmother denied the complaint's allegations but stipulated to a probable-cause finding for the purposes of CCDCFS's motion for predispositional temporary custody. Emergency temporary custody was granted to CCDCFS, and T.W. remained in the agency's care pending further hearings. After a cancellation and Mother's subsequent request for a continuance, the matter was scheduled for adjudication and disposition in April 2024.

**{¶ 5}** Prior to the hearing, T.W.'s guardian ad litem ("GAL") filed a report recommending that either permanent or temporary custody be awarded to CCDCFS. According to the report, the GAL saw temporary custody as a path to a planned permanent living arrangement ("PPLA") when T.W. turned 16.[3] The GAL noted that it would be beneficial for T.W. to retain relationships with his family if significant progress was made on case-plan services.

---

[3] PPLA is statutorily defined as a juvenile court order where (1) "[t]he court gives legal custody of a child to a public children services agency or a private child placing agency without the termination of parental rights" and (2) "[t]he order permits the agency to make an appropriate placement of the child and to enter into a written agreement with a foster care provider or with another person or agency with whom the child is placed." R.C. 2151.011(B)(38). A juvenile court may place a child adjudicated abused, neglected, or dependent in PPLA if the public children services agency or private child placing agency requests such a placement and if the court finds by clear and convincing evidence that (1) a PPLA is in the best interest of the child, (2) that the child is 16 years of age or older, and (3) that certain conditions exist. R.C. 2151.353(A)(5).

**{¶ 6}** In April 2024, Mother requested another continuance, garnering objections from Grandmother, CCDCFS, and the GAL, which the juvenile court denied. CCDCFS also sought to amend its complaint. The complaint for neglect was amended to a complaint for dependency, and the allegations regarding Grandmother were modified to reflect her inability to provide for T.W. and make alternative plans for his care. Grandmother admitted to the allegations of the amended complaint, and the matter proceeded to an adjudicatory hearing over Mother's objections.

**{¶ 7}** During the adjudicatory hearing, testimony was offered by Ciara Elliot ("Elliot"), the extended services case worker of record. Elliot explained T.W.'s history with CCDCFS, noting that he was previously adjudicated dependent and placed in Grandmother's legal custody. According to Elliot, Grandmother placed T.W. in a respite home for the developmentally delayed because of his behavioral issues and disabilities. However, T.W. was unable to stay because he was physically aggressive toward his peers and the staff. Elliot explained that CCDCFS became involved after Grandmother failed to make any plans for his return and T.W. had no place to go. Elliot advised that T.W. had been in CCDCFS's continuous and uninterrupted custody since August 2023, when he could no longer stay at the respite home.

**{¶ 8}** When Elliot received T.W.'s case in August 2023, she reviewed Mother's history with CCDCFS. Elliot learned that five other children were removed from Mother's care because of her mental-health and substance-abuse concerns.

Elliot spoke to Mother regarding her mental-health and substance use, made referrals, and emphasized the importance of completing assessments. However, Mother did not address CCDCFS's concerns and her missed appointments on multiple occasions. According to Elliot, Mother told her that she was unwilling to work toward case-plan objectives to reunify with T.W. because the services were a waste of her time. Elliot stated, "[Mother] advised that [when] push came to shove, she would do it for her other children and not [T.W.]."

{¶ 9} On cross-examination, Elliot advised that Mother completed a parenting class and tested negative on a drug screen but had not engaged in any mental-health services. Elliot acknowledged that Mother had not demonstrated any substance abuse during the pendency of T.W.'s case. After Elliot's testimony concluded, the GAL recommended that T.W. be adjudicated dependent.

{¶ 10} CCDCFS admitted four certified judgment entries that previously adjudicated T.W. and one of Mother's other children dependent and committed them to Grandmother's legal custody. These certified entries referenced Mother's mental-health and substance-abuse issues. CCDCFS also admitted a certified mediation entry, whereby Grandmother received legal custody of another child of Mother's. T.W.'s certified medical records and a family case-plan, noting mental-health concerns, were also admitted.

{¶ 11} After reviewing the testimony and exhibits, the juvenile court adjudicated T.W. dependent. The juvenile court found that Mother had other children removed from her custody and had not, to CCDCFS's knowledge, sought

treatment for her mental-health or substance abuse. The juvenile court further found that Mother and Grandmother could not provide the level of care required to meet T.W.'s basic needs and were unable to come up with an alternative plan.

{¶ 12} Mother then requested a continuance and bifurcation of the dispositional hearing to allow time for a social worker from the public defender's office to meet with T.W. CCDCFS moved for all evidence presented at the adjudication to be incorporated into the dispositional hearing. The motion was unopposed and granted by the juvenile court. The matter was then continued until June 2024.

{¶ 13} On the day of the dispositional hearing, the juvenile court noted that Mother was imprisoned and was not transported for the proceeding despite the issuance of a transport order. The juvenile court advised that while the dispositional hearing could not proceed, it would hear testimony from Elliot regarding the reasonable efforts made by CCDCFS to reunify T.W. with Mother. Elliot testified that case-plan goals for Mother included parenting classes and mental-health and substance-abuse assessments. The case plan also included concerns regarding T.W.'s intellectual disability. Referrals were made for Mother, and services were established for T.W., who was placed in a residential facility through the Board. According to Elliot, CCDCFS contacted Mother and Grandmother and completed various searches to locate any relatives or kin for T.W.'s potential placement. However, CCDCFS was unable to identify anyone who was able and willing to care for T.W.

**{¶ 14}** The juvenile court found that there had not been significant progress on Mother's case plan and the causes for T.W.'s removal had not been alleviated. The juvenile court further found that CCDCFS had made intensive efforts to locate a relative caregiver but no relative was available, willing, or suitable to care for T.W. The juvenile court found that continued temporary custody was necessary and in T.W.'s best interests. Finally, the juvenile court concluded that the interests of justice demanded Mother return to the court for a hearing. The matter was reset for a dispositional hearing in September 2024, and another transport order was issued.

**{¶ 15}** In September 2024, Mother's counsel requested a continuance, advising that she was unable to communicate with Mother after her release from jail. Mother's counsel also requested that Elliot, who was on medical leave, be present for the proceedings in lieu of the CCDCFS supervisor who was present and prepared to testify. The juvenile court granted the request for a continuance, and the matter was set for a dispositional hearing in November 2024, but because of the unavailability of CCDCFS's counsel, the dispositional hearing did not proceed in November 2024 and was reset for January 2025.

**{¶ 16}** Prior to the January 2025 hearing, a motion for continuance was filed on behalf of Mother. According to the motion, and unbeknownst to Mother's counsel, Mother was involved in a life-threatening car accident in November 2024. Counsel recently learned that Mother suffered severe injuries and was being treated at a nursing and rehabilitation facility. The juvenile court granted Mother's motion,

and the matter was continued for disposition in May 2025. In its entry, the juvenile court advised that no further continuances would be granted.

{¶ 17} Nevertheless, Mother's counsel made an oral motion for continuance prior to the commencement of the May 2025 hearing. Mother's counsel explained that she just met a newly proposed legal custodian ("Proposed Custodian"), who was present in court. According to Mother's counsel, Proposed Custodian worked professionally with adults and children with special needs and T.W. was in Proposed Custodian's home when he was six to nine years old. Mother's counsel stated that Proposed Custodian wanted to explore the possibility of taking legal custody and they would like the time to do so. CCDCFS objected to the motion, arguing that numerous continuances had been granted. CCDCFS further argued that T.W. was placed in CCDCFS's custody in August 2023 and Proposed Custodian had not been brought to anyone's attention prior to the May 2025 hearing. The GAL also objected to the motion, arguing that granting legal custody to anyone else was not a realistic option since T.W. needed costly 24-hour care. Ultimately, the juvenile court denied the motion, noting that the dispositional hearing began in April 2024 and the matter was continued multiple times, some at Mother's request.

{¶ 18} After reiterating that the testimony from the adjudicatory hearing was being incorporated into the dispositional phase of the proceedings, the hearing commenced. During opening statements, Mother's counsel argued that a permanent-custody determination was "premature" since "other less-restrictive options" would become available once T.W. turned 16 in July. Mother's counsel

further argued that permanent custody was not in T.W.'s best interest since it would "legally terminate his family ties." Instead, Mother's counsel asked the juvenile court to award temporary custody to CCDCFS "so that other options [could] be explored down the line and [T.W.] [could] continue to be provided services to meet his needs to help him conduct a productive life."

{¶ 19} CCDCFS then continued to present evidence that permanent custody should be granted. Elliot offered additional testimony regarding T.W.'s custodial history and CCDCFS's case plan, which included a primary goal of reunification and secondary goal of permanent custody, in the event Mother failed to make progress with case-plan objectives. At the time of the hearing, T.W. was placed at a residential facility where he was making "[s]ignificant progress" and receiving speech therapy as well as mental-health and wrap-around services for his intellectual disability. T.W. was learning patience and sign language, doing well in school, participating in activities that he normally would not be able to do, and no longer aggressive. Elliot testified that T.W.'s family, including Mother, was not involved in any of T.W.'s services or mental-health appointments. Elliot further testified that someone who does not know sign language would be unable to have conversation with T.W.

{¶ 20} Elliot also offered testimony regarding Mother's progress with her substance-abuse, mental-health, and parenting case-plan goals. While Mother completed one drug screen, which Elliot claimed was insufficient to establish sobriety, she did not comply with subsequent drug-screen requests. Elliot further explained that Mother completed a mental-health assessment and was initially

willing to participate in mental-health services. However, she was discharged from those services because of noncompliance. Finally, Elliot advised that CCDCFS found a nurturing-parent program that specifically focused on T.W.'s needs and would help Mother develop the parenting skills needed to care for her autistic child. Mother attended a few classes but was discharged from the program because of noncompliance. As of the hearing, Mother had not successfully addressed CCDCFS's concerns or made significant progress on her substance-abuse, mental-health, or parenting objectives. Elliot also discussed some difficulties she faced with maintaining contact with Mother throughout the pendency of the case.

{¶ 21} Elliot testified that she spoke to Mother about her lack of compliance with the case plan, but Mother was uninterested in participating in services to reunify with T.W. Elliot stated, "[S]he said that she was kind[ of] tired of having to go through this with [CCDCFS] and at that time she was willing to do it for her other children as long as they would have been able to come home, not specifically for [T.W.]." Mother last contacted Elliot in February 2025. During their conversation, Mother discussed her other children but did not mention T.W. Since February 2025, Mother had not contacted CCDCFS for any updates. Prior to that, Elliot last spoke to Mother about T.W. in July 2024. Between July 2024 and February 2025, Elliot did not receive any notifications from other CCDCFS workers that anyone from T.W.'s family made any inquiries about him.

{¶ 22} According to Elliot, Grandmother, T.W.'s aunt, and T.W.'s siblings, who were in the legal custody of Grandmother and T.W.'s aunt, visited him at the

residential facility. Elliot reported that those visits went well. Mother also made an unplanned visit with T.W. at the residential facility in March 2025. Elliot learned that the visit did not go well and noticed that T.W. was irritable and aggressive afterward. Prior to that, Mother visited with T.W. outside of the facility in December 2023. Elliot observed the visit and explained:

> The visit was going well at first, and [T.W.] became overly stimulated with [Mother] and he tried to attack [her], and at that time the staff that he was placed with had to intervene and restrain him, and [Mother] was standing kind[ of] like towards the wall. She was upset. She was crying, and [T.W.] tried to grab her and they were able to diffuse the situation and get [T.W.] outside. When we went outside [Mother] was talking to [T.W.] and asked could she give him a hug and when she went to try to give him a hug, he tried to attack her again.

Elliot acknowledged that Mother acted appropriately during the visit despite T.W.'s negative reactions. However, Mother did not know how to redirect T.W.

{¶ 23} Ultimately, Elliot believed that Mother was a trigger for T.W. Elliot testified that T.W. never behaved in a similar way toward her, Grandmother, or his aunt or siblings. Elliot explained that T.W. reacted "very well" during her monthly visits with him and he sometimes referred to her as "momma," which she would correct. Elliot would video chat with Mother during her monthly visits so Mother could communicate with T.W. During video visits, T.W. would walk away from the phone. Otherwise, Mother had no contact with T.W. between August 2024, when she last participated in a video chat, and March 2025, when she last visited T.W. at the residential facility. Altogether, Mother interacted with T.W. on four occasions, some of which were prompted by Elliot, throughout the pendency of the case.

{¶ 24} Elliot advised that if CCDCFS received permanent custody, T.W. would remain at the residential facility. Elliot explained that granting CCDCFS permanent custody would not prevent T.W. from continuing to visit with Grandmother, his siblings, and his aunt; CCDCFS would determine who was able visit with T.W. based on his behaviors, and those family members would likely be able to continue visiting. However, because T.W.'s visits with Mother did not go well and he reacted badly, she would not be able to visit.

{¶ 25} Finally, Elliot testified that CCDCFS believed permanent custody was in T.W.'s best interest since he needed permanency. Elliot explained that T.W. would be able to stay at the residential facility and transfer into the adult program once he reached the age of 21, at which time he would be placed under the Board's jurisdiction. Even at that point, Elliot noted that T.W.'s visits and communications with family could continue. In recommending permanent custody be granted to CCDCFS, Elliot emphasized that T.W. needed stability, was receiving it from the residential facility, and was thriving as a result. Otherwise, T.W. did not "have anybody that's consistent in his life" and Mother had "not really made herself available to [CCDCFS] or to the child."

{¶ 26} On cross-examination, Elliot testified that she did not believe T.W. was suited for a family setting. Nor did Elliot believe that a family setting was appropriate considering T.W.'s "one-on-one" needs. Rather, Elliot believed that T.W. required placement in a residential facility, which was likely for the entirety of his life. Elliot did not believe there would be any reason to change T.W.'s placement

if he became eligible for PPLA at the age of 16, since the program "specifies for independent living and he's not at that level [of] capacity even mentally to really understanding the independent living . . . that is specified around that." Elliot reiterated that T.W.'s placement at the residential facility was benefiting him and working.

{¶ 27} Next, the GAL testified that T.W. had limited abilities and was probably going to be in a residential setting for his entire life because of his special needs. The GAL recommended that permanent custody be granted since "he's not [going to] grow up and be able to take care of himself and learn how to meet all of his own needs." The GAL explained, "I think anything less would do him a disservice because of the cost of taking care of him and meeting all of his needs. I wish there was another solution, but I just don't see it." On cross-examination, the GAL testified that she believed PPLA could be appropriate since it would allow him to have ongoing communication with his family; however, T.W. was not 16 years old. The GAL then referenced Elliot's testimony and reiterated that even if permanent custody was granted and family ties were legally severed, she did not believe family visits would stop to T.W.'s detriment. Based on Elliot's testimony, the GAL explained, "[T]he goal would be for him to maintain those communications with his family members and the Board . . . would do the same once he reached the age of 21."

{¶ 28} Following the GAL's testimony, the parties presented their closing statements. During CCDCFS's closing, it addressed Mother's argument regarding PPLA:

> As far as PPLA is concerned, PPLA is not an option because [T.W. is] not 16. Again, this case has been pending for quite some time, since August 2023. But even taking that into account, say [T.W.] was 16 years old or 17 years old, per statute only [CCDCFS] can ask for PPLA, and it is not appropriate in this case because the goal of PPLA is independent living, and there was a lot of testimony taken, questioning from me, questioning from [Mother's] counsel, questioning from the GAL that [T.W.] will not ever live independently. He is always [going to] be in a facility, so it is not something that would be appropriate in this case.

While acknowledging that PPLA was not an option at the time of the hearing since T.W. was 15 years old, Mother's counsel countered that he was "the poster child for PPLA." Mother's counsel argued that it was in T.W.'s best interests to maintain his legal family relationships. Accordingly, Mother's counsel concluded that temporary custody should be granted and the less-restrictive option of PPLA should be reassessed in July, after T.W. turned 16 years old.

{¶ 29} Prior to ruling, the juvenile court recited the case's history, noting the multiple continuances that were granted. The juvenile court stated:

> So when I denied the continuance, I did consider the [required] factors and that is why I denied the continuance, and I just wanted to be clear for the record how many hearings were set in this matter and the reasons. Some are beyond anybody's control, but others were not.

The juvenile court then found that CCDCFS had proven by clear and convincing evidence that permanent custody was in T.W.'s best interest.

{¶ 30} In May 2025, the juvenile court issued its permanent-custody journal entry. After considering the evidence presented, arguments of counsel, recommendation of the GAL, and each of the R.C. 2151.414(D)(1) factors, the juvenile court concluded that permanent custody was in T.W.'s best interest. The juvenile court also concluded that T.W. could not be placed with Mother within a reasonable time or should not be placed with Mother pursuant to R.C. 2151.414(E)(1) and (4). In so ruling, the juvenile court found that T.W.'s return to Mother's home was contrary to his best interests and T.W. could not be placed with a relative since none were available, willing, or suitable to care for him at that time. The juvenile court further found that reasonable efforts were made to prevent T.W.'s removal, return him to Mother's home, and finalize a permanency plan of reunification. However, despite referrals to multiple services — including substance-abuse, mental-health, parenting, and additional services from the Board — Mother's engagement was limited and she refused to assist with T.W.'s mental-health plan. Accordingly, the juvenile court committed T.W. to the permanent custody of CCDCFS; Mother's parental rights and responsibilities were terminated; and an adoption-permanency plan was approved.

{¶ 31} Mother appealed the juvenile court's decision, raising three assignments of error for review.

**Assignment of Error No. 1**

The trial court's judgment granting permanent custody to [CCDCFS] was not based upon sufficient clear and convincing evidence, was

against the manifest weight of the evidence, and the finding of permanent custody was not in the best interests of T.W.

**Assignment of Error No. 2**

The trial court erred in granting permanent custody because it could have extended temporary custody, which would have allowed [CCDCFS] to explore the potential legal custodian and/or allowed T.W. to reach the age of 16, which would allow a consideration of PPLA.

**Assignment of Error No. 3**

The trial court erred by proceeding with the permanent custody hearing when it should have continued it to consider another legal custodian for T.W.

## II.    Law and Analysis

{¶ 32} For ease of analysis, we begin by addressing Mother's third assignment of error, followed by her first and second assignments of error, which we discuss together.

### A. Motion to Continue Permanent-Custody Hearing

{¶ 33} In her third assignment of error, Mother argues that the juvenile court should have continued the dispositional hearing so that Mother and/or Proposed Custodian could file a motion for legal custody pursuant to R.C. 2151.353(A)(3).

{¶ 34} As an initial matter, we note that R.C. 2151.353(A)(3) provides:

If a child is adjudicated an abused, neglected, or dependent child, the court may . . . [a]ward legal custody of the child to either parent or to any other person who, *prior to the dispositional hearing*, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion *filed prior to the dispositional hearing* by any party to the proceedings.

(Emphasis added.) Here, a motion requesting legal custody of T.W. was not filed prior to the dispositional hearing. Nor was Proposed Custodian identified in a complaint or motion by any party prior to the proceeding. Therefore, the requirements set forth by R.C. 2151.353(A)(3) were not satisfied. With this in mind, we consider whether the trial court abused its discretion in denying Mother's motion for continuance.

{¶ 35} The decision to grant or deny a motion for continuance rests in the broad and sound discretion of the trial court. *In re C.W.*, 2020-Ohio-3189, ¶ 15 (8th Dist.), citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An appellate court cannot reverse the trial court's ruling on a motion for continuance absent an abuse of that discretion. *In re S.B.*, 2014-Ohio-4839, ¶ 43 (8th Dist.), citing *Cleveland v. Washington*, 2013-Ohio-367, ¶ 11 (8th Dist.), citing *Unger*. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *In re C.W.* at ¶ 15, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court. *In re C.K.*, 2019-Ohio-4167, ¶ 18 (8th Dist.), citing *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

{¶ 36} When reviewing a trial court's ruling on a motion to continue, "[a]ny potential prejudice to a party denied a continuance is weighed against the trial court's 'right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" *In re I.N.*, 2021-Ohio-1406, ¶ 16 (8th Dist.), quoting *Unger* at 67. There are "no mechanical tests" for deciding when a continuance's

denial is so arbitrary that it violates due process; rather, courts must consider the circumstances in every case and the reasons presented to the trial court at the time. *Id.* at ¶ 17, citing *id.*

{¶ 37} However, there are certain factors that courts should consider when evaluating a motion for continuance, including the following:

> "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel, and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance, which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case."

*Id.*, quoting *id.* at 67-68. While courts are not required to give a particular weight to any one factor, courts in permanent-custody cases must be mindful of the children's best interests and their need for stability and permanency. *In re K.H.*, 2022-Ohio-2588, ¶ 69 (8th Dist.).

{¶ 38} Moreover, certain rules provide guidance regarding the consideration of continuances and timeframes for disposing of certain matters in juvenile court. For example, Juv.R. 23 provides that "[c]ontinuances shall be granted *only* when imperative to secure fair treatment for the parties." (Emphasis added.) Juv.Loc.R.35(C) establishes further parameters:

> No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

{¶ 39} Our review of the record reveals that T.W. was removed from Grandmother's care in August 2023 and remained in CCDCFS's continuous and uninterrupted custody since that time. Following the filing of CCDCFS complaint in January 2024, numerous continuances were granted throughout the case's adjudicatory and dispositional phases, many of which were requested by Mother. In January 2025, after granting another one of Mother's motions for continuances and rescheduling the matter for May 2025, the trial court advised that no further continuances would be granted.

{¶ 40} The record reveals that Mother; counsel for Mother, Grandmother, and CCDCFS; Elliot; and the GAL were present for the May 2025 hearing. Immediately prior to the hearing, Mother's counsel orally moved for a continuance on the grounds that Proposed Custodian wanted to explore the possibility of obtaining legal custody of T.W. Based on the record before us, CCDCFS had no knowledge of Proposed Custodian; indeed, a motion requesting legal custody of T.W. was never filed and Proposed Custodian was never identified in a complaint or motion by any party prior to the dispositional hearing. In response to Proposed Custodian's newfound interest, the GAL expressed concerns that granting legal custody to anyone was unrealistic since T.W. needed costly 24-hour care. Mother did not explain why the Proposed Custodian was not known or identified prior to her appearance at the hearing. Nor did Mother establish that diligent efforts were made to notify CCDCFS as soon as she became aware of the Proposed Custodian or necessity to request a postponement.

{¶ 41} Weighing the potential prejudice to Mother against the juvenile court's right to control its docket, the public's interest in the prompt and efficient dispatch of justice, and T.W.'s best interests and need for stability and permanency, we find that the juvenile court did not abuse its discretion in denying Mother's motion for continuance. Mother did not comply with R.C. 2151.353(A)(3) or Juv.Loc.R. 35(C) and did not show that a continuance was "imperative to secure fair treatment for the parties" as required under Juv.R. 23. On these facts, we cannot say that the juvenile court acted unreasonably, arbitrarily, or unconscionably in denying Mother's motion.

{¶ 42} Accordingly, we conclude that the juvenile court did not abuse its discretion in denying Mother's motion for continuance and overrule her third assignment of error.

### B. Permanent-Custody Standard of Review

{¶ 43} In her first and second assignments of error, Mother challenges the juvenile court's permanent-custody award to CCDCFS. We begin by outlining the applicable standard or review.

{¶ 44} The Ohio Supreme Court clarified that sufficiency of the evidence and/or manifest weight of the evidence are the proper appellate standards of review to apply in cases involving a juvenile court's decision to award permanent custody of a child and terminate parental rights, depending on the nature of the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 18 (holding remand was required where an appellate court applied the abuse-of-discretion standard).

Sufficiency of the evidence and manifest weight of the evidence are two distinct and different concepts: "'sufficiency is a test of adequacy'" while manifest weight depends on the evidence's "'"effect in inducing belief'."'" (Emphasis deleted.) *Id.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. Reversal based on the manifest weight of the evidence is not to be taken lightly. *Id.* at ¶ 16, citing *id.* at ¶ 31. Finally, we note that although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re M.T.*, 2024-Ohio-3111, ¶ 40 (8th Dist.), citing *In re L.H.*, 2024-Ohio-2271, ¶ 29 (8th Dist.).

{¶ 45} With these concepts in mind, we address Mother's specific arguments.

### C. Permanent-Custody Determination

{¶ 46} Mother argues that her parental rights should not have been terminated since alternative options — like extending temporary custody, assessing PPLA, or exploring Proposed Custodian's potential — were available.

{¶ 47} Both the U.S. and Ohio Supreme Courts recognize that parents have a basic and fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 2007-Ohio-1104, ¶ 28. Parental rights, however, are not absolute, and a parent's natural rights are always subject to the child's ultimate welfare. *In re K.M.*, 2015-Ohio-4682, ¶ 15 (10th Dist.), citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Therefore, the "[t]ermination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). By terminating parental rights, the goal is to create a more stable life for dependent children and to facilitate adoption to foster permanency for children. *In re L.W.*, 2017-Ohio-657, ¶ 21 (8th Dist.), quoting *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.).

{¶ 48} When a complaint for abuse, neglect, or dependency contains a prayer request for permanent custody, R.C. 2151.353 applies.[4] R.C. 2151.353(A)(4)

---

[4] We note that Mother cites to R.C. 2151.414(B) to establish certain requirements for terminating her parental rights. R.C. 2151.414(B) applies when a motion requesting permanent custody is filed. Here, CCDCFS requested permanent custody as part of its neglect and dependency complaint. This court has previously explained that when proceeding on a complaint with an original dispositional request for permanent custody, the trial court must satisfy two statutory requirements before ordering a child to be placed in the permanent custody of a children's services agency: R.C. 2151.414(E) and 2151.414(D)(1). *In re A.R.*, 2020-Ohio-5005, ¶ 31 (8th Dist.). Thus, under R.C. 2151.353(A)(4), the juvenile court "does not have to consider the factors in R.C. 2151.414(B), but it must still consider the factors in R.C. 2151.414(E) and determine whether awarding permanent custody to the agency is in the child's best interest under R.C. 2151.414(D)(1)." *In re Bn.J.*, 2024-Ohio-2282, ¶ 39 (6th Dist.), citing *In re L.K.*, 2022-Ohio-1857, ¶ 104 (6th Dist.).

provides that a court may commit a child that is adjudicated abused, neglected, or dependent to the permanent custody of a public children services agency if the court determines that (1) the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent under R.C. 2151.414(E) and (2) permanent commitment is in the best interest of the child under R.C. 2151.414(D)(1).

{¶ 49} The juvenile court's findings and permanent-custody determination must be supported by clear and convincing evidence.

> "Clear and convincing evidence is that measure or degree of proof, which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*In re Z.C.*, 2023-Ohio-4703, at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 50} In instances where clear and convincing proof is required, "'a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus.

### 1. R.C. 2151.414(E) Factors

{¶ 51} After considering all relevant evidence, the court must enter a finding that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent if the court determines, by clear and convincing

evidence, that one or more of 16 enumerated factors exist as to each of the child's parents. R.C. 2151.414(E). Here, the juvenile court found that T.W. could not or should not be placed with Mother based on two factors:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

R.C. 2151.414(E).

{¶ 52} Mother argues that clear and convincing evidence was not presented to support these findings. Relevant to the juvenile court's R.C. 2151.414(E)(1) finding, Mother acknowledges that she did not complete her case plan but claims that she did not repeatedly and continuously fail to substantially remedy the conditions that caused T.W. to be placed outside the home. Mother asserts that she took parenting classes, tested negative for drugs, and completed a mental-health assessment. Mother further claims that she was committed to "helping the best interests" of T.W. even though she did not visit him regularly. Mother asserts that

she should not be blamed for her lack of visitation since she was aware of the problems it created for T.W.

{¶ 53} Relevant to the juvenile court's R.C. 2151.414(E)(4) finding, Mother argues that she did not abandon T.W. or demonstrate a lack of commitment. Rather, Mother claims that she was in communication with Elliot and had at least four interactions with T.W. throughout the pendency of the case. Mother further asserts that she was in a severe accident that precluded her from seeing T.W.

{¶ 54} We note that a juvenile court is only required to find that one of the R.C. 2151.414(E) factors is met to properly find that a child cannot or should not be placed with a parent. *In re Y.F.*, 2024-Ohio-5605, ¶ 43 (8th Dist.), citing *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.). Moreover, "'substantial compliance with a case plan' is not, in and of itself, 'dispositive' and 'does not preclude a grant of permanent custody to a social services agency.'" *In re P.B.*, 2020-Ohio-4471, ¶ 92 (8th Dist.), quoting *In re J.B.*, 2013-Ohio-1704, ¶ 90 (8th Dist.). Indeed, "'[t]he issue is not whether the parent has substantially complied with the case-plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *In re J.B.* at ¶ 90, quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, 11 (9th Dist. Oct. 18, 1995).

{¶ 55} Our review of the record reveals that Mother had a history with CCDCFS, including the removal of other children from her care because of mental-health and substance-abuse concerns. Testimony was offered that ongoing concerns remained, including Mother's mental-health, substance use, and parenting.

Multiple referrals were made to assist Mother with these ongoing issues. While Mother completed a parenting class and tested negative on a drug screen, she did not engage in mental-health services, missed appointments on multiple occasions, never established sobriety by continuing to submit to the requested drug testing, and was discharged from certain programs for noncompliance. Mother also expressed an unwillingness to work toward case-plan objectives to reunify with T.W. According to Elliot, Mother had not addressed CCDCFS's concerns or made significant progress on her case-plan goals at the time of the May 2025 hearing. Testimony was also offered that Elliot had difficulties maintaining contact with Mother and Mother had limited contact with T.W. throughout the pendency of the case, some of which was prompted entirely by Elliot. Elliot also testified that Mother was not involved in any of T.W.'s services or appointments and her visits with T.W. were uniquely troublesome.

{¶ 56} Based on the foregoing, we find that the weight of the evidence supports each of the juvenile court's R.C. 2151.414(E) findings, even though only one is necessary to find that T.W. cannot or should not be placed with Mother.

## 2. R.C. 2151.414(D)(1)'s Best-Interest Factors

{¶ 57} In determining the best interest of a child, the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 58} Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in deciding to award permanent custody, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. The Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 59} Here, the juvenile court noted in its May 2025 decision that it considered each R.C. 2151.414(D)(1) factor and found that permanent custody was in T.W.'s best interest after hearing the evidence presented, arguments of counsel, and the recommendation of the GAL.

{¶ 60} In her first assignment of error, Mother argues that clear and convincing evidence was not presented that CCDCFS's permanent custody — as

opposed to allowing more time to assess other potential options, e.g., PPLA or Proposed Custodian — was in T.W.'s best interests.  Mother claims that while interactions with T.W. were difficult because of his disabilities, there was no testimony that T.W. did not love or want to be around her.  Mother concedes that she did not complete the case plan but qualifies her noncompliance, emphasizing that she did not believe T.W. was coming home to her.  Mother asserts that an extension of temporary custody was in T.W.'s best interest so that family relationships and contacts could continue, T.W. could be considered for PPLA when he turned 16 years old, and potential placement with Proposed Custodian could be explored.

{¶ 61} In her second assignment of error, Mother further argues that the juvenile court should have extended temporary custody to continue T.W.'s current placement and assess whether PPLA was in his best interests once he turned 16 years old.  Since maintaining family relationships and visits were beneficial to T.W., Mother claims that this extension better serves T.W.'s best interests than the permanent-custody determination.  While Mother cites statutes and caselaw to support the proposition that temporary custody may be extended under certain circumstances, Mother does not cite any authority directly supporting her argument that temporary custody should be extended under these specific facts and circumstances.  App.R. 16(A)(7).

{¶ 62} After weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, we cannot say that the juvenile court

clearly lost its way in its resolution of evidentiary conflicts and created a manifest miscarriage of justice in finding that permanent custody was in T.W.'s best interests. With respect to R.C. 2151.414(D)(1)(a), the record reveals that Mother interacted with T.W. on only four occasions — two of which were in person — and that those interactions triggered T.W.  In comparison, T.W. interacted well with his Grandmother, his siblings, and his aunt and their visits were encouraged even after permanent-custody placement with CCDCFS.  The record further demonstrates that T.W. was benefiting from his placement at the residential facility.  T.W. was making significant progress; participating in activities, speech therapy, and mental-health and wrap-around services; learning sign language; and doing well in school.

{¶ 63} While T.W. could not understand the implications of permanent custody to express his wishes under R.C. 2151.414(D)(1)(b), the GAL emphasized T.W.'s needs and recommended that permanent custody be granted to CCDCFS, noting that it was a goal for T.W. to maintain contact with his family members.

{¶ 64} Relevant to R.C. 2151.414(D)(1)(c) — which contemplates the child's custodial history — the record reveals that T.W. was previously adjudicated dependent, removed from Mother's care, and committed to the legal custody of Grandmother in December 2020.  After Grandmother was unable to provide for T.W. or make alternative plans for his care, T.W. was removed from Grandmother's home and remained in CCDCFS's continuous and uninterrupted custody since August 2023.

{¶ 65} Moreover, there was ample evidence of T.W.'s need for legally secure permanent placement under R.C. 2151.414(D)(1)(d). Elliot emphasized T.W.'s need for stability and consistency, the residential facility's ability to provide for those needs, and the ways in which T.W. benefited as a result. Elliot explained that, if CCDCFS was awarded permanent custody, T.W. would remain at the residential facility and transfer into the facility's adult program once he turned 21 years old under the jurisdiction of the Board.

{¶ 66} Finally, the record reveals that Mother's parental rights were previously terminated with respect to at least one of T.W.'s siblings, satisfying R.C. 2151.414(D)(1)(e) by way of R.C. 2151.414(E)(11).

{¶ 67} Thus, there is clear and convincing evidence in the record to support a permanency finding based on the best-interest factors set forth in R.C. 2151.414(D)(1)(a)-(e). Absent any authority to the contrary, we decline to find that an extension of temporary custody — as opposed to the award of permanent custody — better serves T.W.'s best interests.

{¶ 68} Accordingly, we hold that the juvenile court's award of permanent custody to CCDCFS is supported by sufficient evidence within the record and is not contrary to that evidence's manifest weight. Mother's first and second assignments of error are overruled.

{¶ 69} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MICHELLE J. SHEEHAN, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR