**[Cite as *In re C.F.*, 2026-Ohio-1457.]**

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE C.F. | : | |
| | : | No. 115689 |
| A Minor Child | : | |
| | : | |
| [Appeal by L.Y., Mother] | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 23, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22-903100

### *Appearances:*

Wegman Hessler Valore and Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

SEAN C. GALLAGHER, J.:

{¶ 1} Appellant-mother L.Y. ("Mother"), appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") that terminated her parental rights and granted permanent custody of her

minor son, C.F., to appellee the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

## I. Factual Background and Procedural History

{¶ 1} On March 28, 2022, CCDCFS filed (1) a complaint alleging that C.F. (date of birth June 14, 2014) was abused and neglected and requesting an order for temporary custody and (2) a motion for predispositional temporary custody. C.F. had been removed from Mother's care three days earlier, after Mother had left him in the care of his father, D.F. ("Father"), in violation of a no-contact order. The no-contact order was entered after Father was charged with various criminal offenses for shooting Mother in the presence of C.F. in July 2021 (the "July 2021 incident"). The complaint also raised concerns regarding Mother's substance abuse, parenting issues, C.F.'s mental health and school attendance, and Father's issues with domestic violence. On March 29, 2022, C.F. was committed to the emergency temporary custody of the agency. In April 2022, Father pled guilty to felonious assault, having weapons while under disability, domestic violence, and endangering children in connection with the July 2021 incident and was sentenced to community-control sanctions.

{¶ 2} In July 2022, Mother and Father admitted the allegations of an amended complaint and stipulated to a finding of neglect and a disposition of

temporary custody.[1]  On August 3, 2022, the juvenile court adjudicated C.F. neglected and committed him to the temporary custody of the agency.

{¶ 3}  The agency initially developed, and the juvenile court approved, a case plan that included objectives to address Mother's issues with parenting, mental health, substance abuse, and domestic violence.  The case plan was later amended to also include family counseling and anger management for Mother.[2]

{¶ 4}  Temporary custody was extended in March 2023.  While he was in temporary custody, C.F. was placed with his adult half-sister (Father's daughter), J.F.  Finding that Mother had made significant progress on the case plan and progress had been made in alleviating the cause for removal of C.F. from the home, on October 10, 2023, the juvenile court terminated temporary custody and returned C.F. to the legal custody of Mother with protective supervision by CCDCFS.  The

---

[1] The amended complaint alleged, in relevant part:

1.      Mother allowed father unsupervised access of the child despite a No-Contact Order and father's criminal history.

2.      [Father] has pending charges for Felonious Assault and Having Weapons Under Disability related to an incident in which he shot mother.  See Case No. CR-21-661689.

3.      Mother would benefit from a substance abuse program in order to provide appropriate care for the child.

4.      Mother was unable to schedule a mental-health assessment for the child as required by the child's school.

5.      Mother has failed to ensure that CF consistently attends school.

[2] Because Father has not appealed the juvenile's court's judgment, we limit our discussion of the facts, evidence, and findings to those that pertain primarily to Mother.

juvenile court also ordered Mother (1) to ensure C.F. attended school, (2) to ensure C.F. was engaged in ongoing individual and family counseling, (3) to facilitate visitation between C.F. and J.F., (4) to meet with C.F.'s psychiatric services provider to discuss medication recommendations for C.F., and (5) not to argue with Father in the direct or indirect presence of C.F.[3]

{¶ 5} In April 2024, because of an increase and intensification of negative behaviors by C.F. after he was reunified with Mother and because of Mother's disruption of C.F.'s mental-health services, failure to promptly engage with his psychiatric services, failure to facilitate visitation with J.F., and display of combative and uncooperative behavior that interfered with her ability to provide appropriate care for C.F., C.F. was again removed from Mother's care. On April 19, 2024, C.F. was committed to the emergency custody of the agency. On May 13, 2024, he was placed in the temporary custody of the agency for the second time.

{¶ 6} On September 27, 2024, CCDCFS filed a motion to modify temporary custody to permanent custody. In the months that followed, Mother filed motions requesting that she be granted legal custody of C.F. or, in the alternative, that her adult daughter (and C.F.'s sister), M.F., be granted legal custody of C.F. Father filed a motion requesting that he be granted legal custody of C.F. In April 2025, the magistrate conducted an in camera interview of C.F.

---

[3] The no-contact order was lifted in December 2022 after Father completed a domestic-violence program. Father's community control was terminated in October 2023.

**A. The Permanent Custody Hearing**

{¶ 7} On June 5, 2025, the magistrate held an evidentiary hearing on the agency's motion for permanent custody and the parents' motions for legal custody. At the time of the hearing, C.F. was 10 (soon-to-be 11) years old.

{¶ 8} The agency presented testimony from Amber May, an extended services supervisor for CCDCFS; Kaitlyn Kedzierski, an extended case worker for CCDCFS; B.F., C.F.'s counselor, a behavioral health specialist at Ohio Guidestone; and J.F. Mother presented testimony from M.F. The parties also introduced various exhibits. A summary of the relevant evidence follows.

### 1. Testimony by CCDCFS Case Workers

{¶ 9} May and Kedzierski testified regarding C.F.'s custodial history, Mother's compliance with case-plan services, and the extent to which Mother met case-plan objectives. May testified that the agency initially became involved with the family in March 2022 after receiving a report that C.F. was unable to return to school until he received a psychological evaluation. She indicated that, at that time, there were also concerns related to the July 2021 incident, Mother permitting Father to have contact with C.F. in violation of the no-contact order, Mother and Father drinking and "get[ting] aggressive and fight[ing]," and C.F. witnessing Mother overdose.

{¶ 10} May testified that parenting was initially put on Mother's case plan because of concerns regarding her judgment in permitting C.F. to have contact with Father in violation of the no-contact order and for failing to meet C.F.'s mental-

health needs. May indicated that although Mother completed a nurturing parenting program during C.F.'s first period of temporary custody, Mother continued to exhibit behaviors that demonstrated a failure to benefit from the parenting services she had previously completed, including having inappropriate communications with C.F., exposing C.F. to adult conflicts, including C.F. in discussions with the agency regarding his custodial status (despite repeated requests by the agency that she not do so), and displaying "[v]ery angry, very erratic" behavior in the presence of C.F. As a result of the agency's continuing concerns regarding Mother's parenting, Mother was referred for additional parenting services. Kedzierski, who made the referral, testified that the agency did not receive any documentation that Mother had engaged in those services and that it was not until the day of the hearing that she was "made aware" that Mother was participating in a parenting class.

{¶ 11} With respect to the substance abuse element of Mother's case plan, May testified that there were concerns regarding Mother's alcohol use and whether it impacted her ability to care for C.F., ensure that he received necessary mental-health services, and attended school consistently. Although Mother had completed a drug and alcohol assessment during C.F.'s first period of temporary custody and no treatment recommendations were made at that time, May stated that the agency had renewed concerns regarding Mother's substance use after an agency case worker and school officials subsequently observed Mother to be "under the influence." To address these concerns, Mother was referred for a second assessment in which she was diagnosed with mild alcohol use disorder for which substance-

abuse treatment services were recommended. May testified that Mother refused to comply with recommended services.

{¶ 12} To demonstrate her sobriety, Mother was also asked to submit to random drug screens. May testified that Mother would "typically not go on the day that she was asked or she would not go at all" and that these delays or failures were viewed by the agency as presumptively positive screens. Kedzierski testified that Mother tested positive for cocaine in January 2025 and thereafter refused to submit to any drug screens requested by CCDCFS, and, instead, had her own drug test performed (by a lab used by the court). Kedzierski stated that although Mother provided the negative results of that test to the agency, those results could not be used as verification of her sobriety for agency purposes because the test was not administered in accordance with agency protocols.

{¶ 13} During the first period of temporary custody, Mother completed a domestic violence program and that element was removed from her case plan. May testified that Mother was later asked to engage in anger-management services because Mother was "struggling to manage conflict, whether it was conflict with the school, conflict with the worker, conflict with dad." She indicated that she had personally observed Mother upset or agitated during court hearings and agency meetings, "[y]elling, not listening to what others have to say, not being able to be redirected." She stated that Mother was referred to West Side Community House for anger-management services but that she did not complete them.

{¶ 14} With respect to Mother's mental health, May testified that Mother completed a mental-health assessment during the first custodial period and was at one time receiving counseling services for depression and anxiety. When her insurance lapsed, Mother was referred to Ohio Guidestone for mental-health services. Mother did not engage in services at Ohio Guidestone but claimed to be receiving mental-health services through Signature Health. May testified that the agency was able to verify that Mother was engaged with mental-health services but that the limited nature of the release provided prevented the agency from obtaining information regarding the nature of the services Mother was receiving or her level of engagement with those services. Kedzierski testified that the last provider update she received was in February 2025 and that she, therefore, could not be certain whether Mother was still engaging in mental-health services at the time of the hearing.

{¶ 15} The family was also referred for family counseling to address the impact of the July 2021 incident and the conflict within the home on C.F. May testified that although the family initially engaged in family counseling, they discontinued family counseling in November 2023 after Father stated he was not willing to participate in any further family counseling and Mother indicated that she was unwilling to engage in family counseling through Ohio Guidestone.

{¶ 16} While C.F. was in the care of J.F., J.F. ensured that C.F. received all needed services. May testified that during his first period of temporary custody, C.F. made "significant progress" "manag[ing] his emotions" and "doing better in school."

Based on C.F.'s progress and Mother's perceived progress with her case-plan objectives, C.F. was returned to Mother's custody with protective supervision in October 2023.

{¶ 17} May testified that after C.F. was reunited with Mother, he regressed. Although Mother initially continued C.F.'s individual counseling, C.F. did not receive psychiatric services, Mother discontinued his medication, and C.F. began having "outbursts at school" and threatening self-harm. And despite being ordered by the court do so, Mother did not facilitate visitation between C.F. and J.F. She indicated that after C.F. was removed from Mother's care and placed with J.F. a second time, his counseling and medication were "put back into place" and that, as of the time of the hearing, C.F. was "doing well."

{¶ 18} Kedzierski testified that after C.F. was returned to temporary custody, the parents were scheduled for weekly, two-hour supervised visits with C.F. Visits were originally scheduled to be held at the West Side Community House, but after the parents failed to attend any visits in March 2025, the family was removed from the visitation list. Kedzierski testified that visitation thereafter was "[e]xtremely inconsistent," with the parents missing more visits than they attended. Kedzierski stated that C.F. had pointed out to her that the parents would typically request a visit before an important date, such as an in camera interview or a court hearing.

{¶ 19} Kedzierski testified that when the parents did attend visits, "[e]very visit there tends to be some inappropriate conversation, whether it's about the case plan or Court hearings. There is usually something inappropriate that happens."

She indicated that during visits, C.F. usually played games on Father's phone and that Mother sat and talked with him or played a board game. Kedzierski testified that she did not believe C.F. spoke openly with his parents but rather "would kind of tell them what they want to hear." She noted the parents' conversation with C.F. regarding school or his life often involved "back-handed comments" that upset C.F. and that C.F. had cried at each visit because of his parents' behavior.

{¶ 20} Kedzierski testified that C.F.'s relationship with J.F. is "positive," that C.F. "seems happy" living with her, and that C.F. responds to J.F.'s directions. Kedzierski indicated that J.F. is "really good with him," "can tell when he's about to kinda have a little freak-out and . . . can calm him down really easily," and that when in her care, C.F. is "really on top of his feelings" and able to recognize when he needs to calm down — something she had "never seen him do . . . before." She stated that, in contrast, when visiting with his parents, C.F. "kind of tells his parents to calm down and not get mad and not to scream . . . like he has to act more grown up around the parents than with his caregiver."

{¶ 21} May described the relationship between the parents and J.F. as "[s]trained and toxic." She indicated that Mother had "talked very negatively" about J.F. to C.F. and had made unsubstantiated allegations of abuse of C.F. by J.F.

{¶ 22} May testified that, in her view, permanent custody was in C.F.'s best interest because Mother and Father had not made significant progress on their case-plan objectives and continued to "minimize[] the events leading to the custody as well as [C.F.'s] needs." May explained that she did not believe that if C.F. were to be

reunified with one of his parents his mental-health and educational needs would be met because "I don't believe that the parents feel that he has any needs that need to be met. I don't believe that they would seek out psychiatric services or even continue with counseling services for him."

{¶ 23} Kedzierski similarly opined that permanent custody was in C.F.'s best interest based on what she described as "a lack of accountability" by C.F.'s parents. She explained:

> I think the parents blame everyone else but themselves.
>
> I don't think it's fair to keep putting [C.F.] through missed visitations that are starting to upset him.
>
> I don't think it's fair to send [C.F.] back and not receive the mental health that he's receiving now.
>
> I don't think it's fair to remove [C.F.] from his safe place and I don't believe that if case plan service[s] are to be completed, that they will benefit due to the lack of accountability.

### 2. Testimony by C.F.'s Counselor

{¶ 24} B.F., C.F.'s counselor, testified that she began working with C.F. in September 2022 to address issues with anger, trauma, sleep, hyperactivity, and impulsivity related to several diagnoses, including post-traumatic stress disorder and ADHD. She stated that until October 2023, she had met with C.F. twice a week but that after C.F. was reunified with Mother, "[s]essions were cancelled pretty often by his parents," who "made it very difficult" for B.F. to see C.F. and "[C.F.'s] behavior started to regress significantly."

**{¶ 25}** B.F. indicated that C.F.'s parents "pulled [C.F.] off of his medicine cold turkey," which "caused him dysregulation." She explained:

> He started acting out in school. His grades were dropping. . . . His behaviors were starting to regress. He was becoming more argumentative, more defiant.
>
> He couldn't sit still. . . . He was almost expelled from one school. He had ended up targeting another child. He had bitten a child a couple of times. He wasn't really doing any classwork. They couldn't get him to do anything. . . .
>
> He got to the point he was throwing desks, he was throwing chairs. He was yelling and cursing teachers out.

**{¶ 26}** B.F. testified that C.F.'s parents tried moving him to a different school but that "[h]is behaviors continued there. You couldn't even get him to keep his shoes on. . . . He threatened to stab a teacher with scissors. He was throwing desks. He was just extremely dysregulated." Although B.F. spoke with Mother about getting a behavioral IEP for C.F., Mother "never started that process, and it just became worse and worse."

**{¶ 27}** B.F. further testified that, according to C.F., Mother told C.F. to lie to B.F. about abuse by J.F., "threaten[ing] him with consequences" if he failed to comply, and that Mother often undermined B.F.'s efforts to teach C.F. coping skills, refusing to attempt suggested interventions and instead, ridiculing and yelling at C.F. B.F. testified that, in April 2024, she attempted to get C.F. enrolled in intensive services "because his behaviors were so out of control" but that the parents conditioned C.F.'s participation in services on B.F.'s lying in court, which she refused to do:

They told me that if I were to come in and say that they were doing everything that they could do and that they were following all suggestions and worked with them to get DCFS out of their lives, then they would think about the programming or getting more services that would help him.

{¶ 28} B.F. stated that after she refused their request, the parents "made it even harder to have sessions," and, ultimately, "stopped sessions completely" and "worked to get [her] off of his case and close his services."

{¶ 29} B.F. testified that after C.F. was committed to temporary custody a second time and returned to the care of J.F., she went back to meeting with C.F. twice a week. She stated that C.F. then did "a 180," i.e., he "re-regulated once he was back in a calmer and more regulated environment" with J.F. As she described the change in his behavior:

He uses his coping skills daily. His school attendance and behaviors have just shot through the roof. He's making A's and B's.

He is using words. He hasn't gotten in trouble at school. There's no more violence. There's no more aggression. . . . Once he got reunified, it was almost like he was in fight-or-flight mode all the time, but now he's really — he's very, very regulated, and he like yearns to understand.

B.F. indicated that, in contrast to Mother, J.F. tried every suggested intervention technique and provided feedback to assist in C.F.'s treatment.

{¶ 30} Although B.F. refused to offer an opinion regarding the likely impact on C.F. if he were to be returned to Mother's care, B.F. testified that C.F. had disclosed to her that he feared being reunified with his parents — i.e., that "he fears the fighting, the arguments" and "being in trouble" — and that his parents had

blamed him for his removal, telling him, during a recent visit, that "this whole process was his fault, it's his fault he was removed."

### 3. Testimony by J.F. and M.F.

{¶ 31} J.F., C.F.'s half-sister, who worked as a program coordinator for a daycare center, was C.F.'s caregiver during both periods of temporary custody. J.F. lived with her fiancé and their son, in a home owned by her fiancé. J.F. testified that when C.F. first entered her care in 2022, he was struggling to focus, had been out of school for a period of time because "he needed a psychiatric evaluation that he did not get," and was having nightmares and "accidents" and was "afraid to sleep by himself." J.F. testified that C.F.'s behavior improved after he was prescribed medication for ADHD and J.F. reenrolled him in school, took him to weekly psychiatrist appointments, engaged him in counseling with B.F., established relationships with school personnel, and worked with C.F. on developing coping skills.

{¶ 32} J.F. stated that after C.F. was reunified with Mother in October 2023, she had virtually no contact with him and only "got to talk to him once." She stated that when the agency approached her about taking C.F. a second time, she was, at first, "a little hesitant." She explained that having C.F. taken from her home and "not being able to see him" was "hard for [her] mentally," that she had concerns regarding how "[C.F.'s] behavior was gonna be coming back into [her] home," and that she had concerns regarding Mother. She testified that Mother had previously "threatened" her, had once "[k]nock[ed] on [J.F.'s] neighbor's door to tell them that

[J.F.'s] fiancé rapes children" during a visitation exchange, and had "scream[ed] a bunch of other random things" while C.F. and J.F.'s son were within earshot.

{¶ 33} J.F. testified that after C.F. was again placed with her in April 2024, C.F. transitioned back "without too many problems" into the "normal routines," structure, expectations, and accountability J.F. had imposed to help minimize the negative behaviors associated with C.F.'s ADHD. J.F. indicated that C.F. "was very excited to be back at [her] house," that C.F. was bonded with J.F. and her family, and that he "share[s] a special love" with J.F.'s three-year-old son. J.F. stated that since his return to her care, C.F. has received the mental-health services he needs and that she also sought out additional services for him, including equine therapy, group services, and speech services. J.F. testified that C.F. was doing well in school and had "got[ten] to the point to where he is thriving socially and he makes friends and communicates his feelings well."

{¶ 34} J.F. testified that after C.F. was returned to her care, the parents did not visit consistently with C.F. She indicated that, at first, when his parents cancelled visits, C.F. would "get extremely emotional and he would cry for a while" but that, more recently, C.F. would get angry rather than emotional when his parents did not visit as scheduled.

{¶ 35} J.F. testified that she was willing to provide permanency for C.F. but did not want legal custody; she preferred to adopt C.F. She stated that if C.F. were to remain with her, she would permit C.F. to maintain a relationship with his parents so long as it was appropriate, but that if C.F. were to be returned to Mother's care,

J.F. did not believe that Mother would facilitate an ongoing relationship between C.F. and J.F.

{¶ 36} Mother's daughter, M.F., was Mother's sole witness. M.F. testified that she would be willing to serve as a legal custodian for C.F. if the court did not reunify him with one of his parents. M.F. stated that she believed she would be a better caregiver for C.F. because "he is currently not getting as much attention as he needs" and she would "be able to take care of him one on one." M.F. had recently moved out of Mother's home and was living in an apartment she shared with her boyfriend. M.F. indicated that she was currently on probation, admitted to a history of methamphetamine use (with a sobriety date of April 16, 2021), and admitted to having previously given the guardian ad litem a false statement. M.F. had lived with J.F. and C.F. during C.F.'s first period of temporary custody and claimed that J.F. told C.F. everything about the case and court proceedings, "things that he wasn't even supposed to know," and that she left J.F.'s home, in part, because she "didn't like the way they were treating [C.F.]."

{¶ 37} M.F. testified that although she was aware C.F. received mental-health services, she did not believe C.F. had any mental-health diagnoses or mental illnesses and was just "going through some things that any kid would react this way to" and that he "needs a little bit more affection." M.F. testified that she had visited C.F. twice in 2024 and "a little bit more than two times" in 2025 during visits with her parents but that she had never reached out to see C.F. outside of those visits.

## B. Guardian Ad Litem's Recommendation

{¶ 38} The guardian ad litem recommended that the agency be granted permanent custody of C.F. based on, among other factors, Mother's consistent minimization of the July 2021 incident, Mother's history of being neglectful of C.F.'s educational and mental-health needs, Mother's failure to benefit from services and to comply with the court's orders, the "toxic" relationship between the parents, and Mother's inappropriate interactions with C.F.

## C. The Juvenile Court's Decision

{¶ 39} On June 26, 2025, the magistrate issued a decision denying the parents' motions for legal custody and granting the agency's motion for permanent custody, terminating Mother's and Father's parental rights. Mother filed objections to the magistrate's decision. On October 2, 2025, the juvenile court journalized a judgment entry approving and adopting the magistrate's decision, overruling Mother's objections to the magistrate's decision, denying the parents' motions for legal custody, and granting the agency's motion for permanent custody, terminating Mother's and Father's parental rights.

{¶ 40} Mother appealed, raising the following two assignments of error for review:

> Appellant's First Assignment of Error: The trial court's decision to terminate Appellant's parental rights and to award permanent custody of the [child] to CCDCFS was not supported by sufficient evidence.
>
> Appellant's Second Assignment of Error: The trial court's decision to terminate Appellant's parental rights and to award permanent custody

of the [child] to CCDCFS was against the manifest weight of the evidence.

## II. Law and Analysis

### A. Requirements for Granting Permanent Custody to CCDCFS

**{¶ 41}** Under R.C. 2151.414(B)(1), a juvenile court may grant a public children services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following circumstances exists:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated

an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 42} "Clear and convincing evidence" is that "'measure or degree of proof'" that "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

**B. The Juvenile Court's Findings under R.C. 2151.414(B)(1)**

{¶ 43} Here, the juvenile court found that R.C. 2151.414(B)(1)(d) applied, i.e., that C.F. had been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two-month period. That finding is supported by clear and convincing evidence in the record. The record reflects that C.F. was in agency custody from March 2022 until October 10, 2023, and again beginning in April 2024. R.C. 2151.414(B)(1)(e) states: "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." Therefore, C.F. had been in agency custody for twelve or more months of a consecutive twenty-two-month period at the time CCDCFS filed its permanent-custody motion on September 27,

2024. Although no further findings were required to satisfy this prong of the permanent custody statute, the juvenile court also found that R.C. 2151.414(B)(1)(a) applied, determining that C.F. could not be placed with one of the child's parents within a reasonable time or should not be placed with either parent, based on findings pursuant to R.C. 2151.414(E)(1), (2), and (4).[4] R.C. 2151.414(B)(1)(a) and (d) are alternative findings. Only one is required to support the granting of permanent custody to the agency. Mother has not specifically challenged these findings on appeal. Accordingly, we do not address them further here.

---

[4] The juvenile court's findings under R.C. 2151.414(E)(1), (2) and (4) were as follows:

Pursuant to O.R.C. 2151.414(E): The Court finds that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(2) The chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

If the juvenile court determines, by clear and convincing evidence, that one or more of the R.C. 2151.414(E) factors exist as to each of the child's parents, the court "shall" enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

### C. The Juvenile Court's Best-Interest Determination

{¶ 44} Mother's challenges to the juvenile court's judgment focus on the court's best-interest determination. R.C. 2151.414(D) sets forth the factors a juvenile court is to consider in determining what is in the best interest of a child in a permanent custody hearing. R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
>
> (e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

{¶ 45} The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.). Although the juvenile court is required to consider each relevant factor in determining what is in a child's best interest, no one factor is required to be given greater weight than the others. *In re A.L.*, 2024-Ohio-1992, ¶ 31 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Further,

only one of the factors needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest and terminate parental rights. *In re R.M.*, 2024-Ohio-1885, ¶ 60 (8th Dist.); *In re N.B.* at ¶ 53.

**{¶ 46}** A juvenile court's decision to grant permanent custody of a child to CCDCFS is reviewed under sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review depending on the nature of the arguments presented. *In re Z.C.*, 2023-Ohio-4703, at ¶ 11; *In re T.W.*, 2026-Ohio-124, ¶ 44 (8th Dist.). Mother raises both types of challenges here.

### 1. Sufficiency of the Evidence

**{¶ 47}** In her first assignment of error, Mother argues that there was insufficient evidence to support three factual findings set forth in the juvenile court's October 2, 2025 judgment entry: (1) the juvenile court's finding that Mother "has not engaged with any further parenting courses since the nurturing parenting classes where she failed to fully benefit," (2) the juvenile court's finding that Mother had "no verifiable sobriety," and (3) the juvenile court's finding regarding "the timing of events" that led to Mother's referral for a second drug and alcohol assessment. Mother contends that because the trial court "incorporated these . . . findings in determining that C.F. could not return safely home," the findings "cannot be disentangled from the trial court's judgment in any meaningful way" and that, therefore, the entire juvenile court judgment is not supported by sufficient evidence. We disagree.

**{¶ 48}** "'[S]ufficiency is a test of adequacy.'" *In re Z.C.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the [factfinder's determination] as a matter of law." (Internal quotations and citations omitted.) *In re Z.C.* at ¶ 13.

**{¶ 49}** First, although Mother filed objections to the magistrate's decision, she did not challenge these findings in her objections. Nor has she argued on appeal that these findings amount to plain error. *See* Juv.R. 40(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)."); *see also In re T.R.*, 2025-Ohio-2531, ¶ 24 (8th Dist.). Even if we were to consider the issue, we would find no plain error here. In appeals of civil cases, plain error is not favored and is only applicable in the rare case in which the error "'seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" *In re S.M.*, 2025-Ohio-5144, ¶ 15 (8th Dist.), quoting *Hamilton v. Hamilton*, 2016-Ohio-5900, ¶ 8 (10th Dist.); *In re T.R.* at ¶ 25; *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

**{¶ 50}** With respect to the juvenile court's finding related to parenting classes, Kedzierski testified that after she made a second referral for Mother for

parenting services, the agency never received any documentation that Mother had engaged in those services and that it was not until the day of the hearing that she was "made aware" that Mother was participating in a parenting class. No further inquiry was made into the issue at the hearing. Accordingly, no evidence was presented as to how Kedzierski was "made aware" of this claim, who made her aware of this claim, and what information, if any, was provided to support Mother's claim that she was then participating in a parenting class.

**{¶ 51}** In addition, Mother challenges the juvenile court's finding that Mother was referred for a second drug and alcohol assessment due to "*subsequent* concerns regarding substance abuse reported by a worker and someone at school." (Emphasis added.) Mother contends that "CCDCFS got an answer it did not like" with its first assessment and simply "went back to the well."

**{¶ 52}** However, May clearly testified that it was *before she was assigned to the case* — i.e., prior to mid-February 2024 — that Mother completed an initial drug and alcohol assessment. May further testified that it was *during the time she was assigned to the case* that an agency case worker and school officials observed Mother to be "under the influence," leading to a second referral for a substance-abuse assessment.

**{¶ 53}** Mother also contends that the juvenile court's finding that Mother has "no verifiable sobriety date" is not supported by the record because the juvenile court "completely ignored Defendant's Exhibit 12 though CCDCFS's witnesses had to admit it was a negative hair follicle screen conducted by the very same lab

CCDCFS sends people to." However, no Defendant's Exhibit 12 was offered into evidence at the hearing. The only exhibit Mother offered into evidence was an "Exhibit A," a copy of an assessment she had completed at Signature Health in April 2024. That assessment recommended that Mother engage in individual counseling services but indicated that Mother had refused such services. CCDCFS offered an "Exhibit 12," which was admitted into evidence, but that exhibit consisted of records relating to the drug and alcohol screens CCDCFS had requested.

{¶ 54} Although Kedzierski testified that Mother had arranged for her own drug test in or after February 2025, which was negative, the evidence established that because that test was administered outside of agency protocols, it could not be considered by the agency in determining Mother's sobriety date for agency purposes. Accordingly, the juvenile court's findings related to the timing of the referral for the second substance-abuse assessment and that Mother had no verified sobriety date are sufficiently supported by the record.

{¶ 55} Further, even if one these factual findings was erroneous and not sufficiently supported by the record, that would not preclude the court from otherwise affirming the juvenile court's decision. *See, e.g., In re T.T.*, 2024-Ohio-2914, ¶ 17 (8th Dist.) ("Although the trial court made an erroneous finding, 'that does not preclude us from finding that the trial court's judgment [awarding permanent custody to the agency] is nevertheless correct.'"), citing *In re J.T.*, 2004-Ohio-5797, ¶ 36 (2d Dist.). It is clear from a reading the juvenile court's decision that these findings, in and of themselves, were not determinative of the juvenile

court's best-interest determination. Accordingly, we overrule Mother's first assignment of error.

### 2. Manifest Weight of the Evidence

**{¶ 56}** In her second assignment of error, Mother contends that the juvenile court's determination that granting permanent custody to the agency was in C.F.'s best interest was against the manifest weight of the evidence.

**{¶ 57}** When reviewing a juvenile court's decision regarding permanent custody for manifest weight of the evidence,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.*, 2023-Ohio-4703, at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

**{¶ 58}** Mother argues that the juvenile court's best-interest determination was against the manifest weight of the evidence because (1) "there was a Motion for Legal Custody to J.F., the sister with whom C.F. had been placed," such that "[c]learly, and convincingly, there was a legally secure placement that could be achieved without resorting to permanent custody," (2) C.F.'s counselor, B.F., had a conflict of interest, based on her own CCDCFS case, that undermined her testimony regarding Mother's failure to appropriately address C.F.'s mental-health needs and his decline when in Mother's care and (3) evidence showed that Mother was "making significant progress" on her case plan. Once again, we disagree.

{¶ 59} First, the record reflects that it was not J.F., but M.F., who filed a motion for legal custody of C.F. J.F. testified that although she was willing to provide permanency for C.F., she did not want to do so by being granted legal custody of C.F.; she wanted to adopt him. The juvenile court reasonably determined that placing C.F. in the legal custody of M.F. would not be in his best interest based on — among other factors — the juvenile court's assessment of her credibility as "questionable," her failure to acknowledge C.F.'s mental-health needs, and her limited relationship with C.F.

{¶ 60} Second, the juvenile court was not required to disregard B.F.'s testimony simply because she, at one time, had an open case with CCDCFS. B.F. testified that, in June 2024, her daughter was removed from her care and placed in the temporary custody of CCDCFS after B.F. requested the agency's assistance in obtaining mental-health treatment for the child. B.F. further testified that, at the time of the hearing, the case had been adjudicated and the child had been returned to the home. B.F. had been C.F.'s counselor since 2022 and had previously testified in the case in April 2024 — prior to any personal agency involvement.

{¶ 61} Mother offered no evidence that B.F.'s personal involvement with CCDCFS had any bearing on the testimony she provided with respect to C.F., and Mother's counsel cross-examined B.F. regarding the alleged conflict of interest. The juvenile court was free to assess B.F.'s credibility and weigh her testimony just as it did every other witness.

{¶ 62} Finally, with respect to Mother's claim of progress on her case plan,

simply because a parent completes services identified in a case plan does not mean he or she has achieved the objectives of the case plan related to those services or has substantially remedied the conditions that caused the child to be removed from the home. *See, e.g., In re J.B.*, 2013-Ohio-1704, ¶ 90 (8th Dist.). Significant or even substantial compliance with case-plan services is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency." *Id.*, citing *In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.); *see also In re R.D.*, 2022-Ohio-4519, ¶ 59 (8th Dist.). "'The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *In re J.B.* at ¶ 90, quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, *11 (9th Dist. Oct. 18, 1995); *In re R.D.* at ¶ 59.

**{¶ 63}** Although it was Mother's initial progress with her case plan that led to C.F. being reunified with Mother in October 2023, it was clear, after he was returned to her care, that Mother had not, in fact, sufficiently benefited from the services she had received to appropriately attend to his needs.

**{¶ 64}** Evidence was presented that little had changed with respect to Mother by the time of the hearing. More than a year after C.F. had been removed from her care for the second time, Mother had, at most, started parenting classes. She had not completed a second parenting program or an anger-management program. After being diagnosed with a mild alcohol disorder, she refused recommended treatment and refused to submit to requested drug screens to

demonstrate her sobriety after testing positive for cocaine. Mother had not reengaged in family counseling, and although Mother may have been receiving services for her own mental-health issues, she refused to provide a sufficient release to enable the agency to determine the nature of the services she was receiving and her progress with those services. Mother's visitation with C.F. was inconsistent and her communications with C.F. were often inappropriate and upsetting to C.F. There was nothing in the record to suggest that Mother had taken any steps toward understanding C.F.'s mental-health and educational needs or demonstrating a commitment to ensuring those needs would be met. The agency presented credible, clear and convincing evidence that, as of the time of the hearing, Mother had not substantially remedied the conditions that caused C.F.'s removal and that there was no indication she would do so at any reasonable time in the future.

{¶ 65} The record shows that the juvenile court carefully considered the relevant R.C. 2151.414(D)(1) factors, the evidence presented at trial, an in camera interview with C.F., and the recommendation of the guardian ad litem in determining that permanent custody to the agency was in C.F.'s best interest. In its October 2, 2025 journal entry, the juvenile court identified the specific factors it considered, including all of the factors specified in R.C. 2151.414(D)(1), and set forth detailed factual findings explaining its reasoning. Despite Mother's arguments to the contrary, the record supports the juvenile court's best-interest determination.

**{¶ 66}** Although C.F. had a bond with and affection for his parents, the evidence established that C.F. was also strongly bonded with J.F. and her family. *See* R.C. 2151.414(D)(1)(a).

**{¶ 67}** The guardian ad litem recommended that permanent custody be granted to the agency. C.F. had separate counsel appointed to represent his interests who advised the court that C.F. wished to remain with J.F. The juvenile court also heard directly from C.F. regarding his wishes during an in camera interview. *See* R.C. 2151.414(D)(1)(b).

**{¶ 68}** By the time of hearing, C.F. had been in agency custody for nearly 33 of the past 39 months and was in need of a safe, stable, permanent placement that, for the reasons detailed above, Mother could not provide and could not be expected to provide at any reasonable time in the future. Whereas in Mother's care, C.F. was struggling; under J.F.'s care, his mental-health and educational needs were being met and he was thriving. J.F. testified that she was willing to provide permanency for C.F. by adopting him. *See* R.C. 2151.414(D)(1)(c)-(d).

**{¶ 69}** The record shows the juvenile court engaged in a proper analysis and made the requisite statutory determinations, supported by clear and convincing evidence, in granting permanent custody to the agency. Following a thorough review of the record, having weighed the evidence and all reasonable inferences, and having considered the credibility of the witnesses, we cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that its

judgment must be reversed and a new trial ordered. *In re Z.C.*, 2023-Ohio-4703, at ¶ 14. Accordingly, we overrule Mother's second assignment of error.

**{¶ 70}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
TIMOTHY W. CLARY, J., CONCUR